STATE of Minnesota, Respondent,

v.

Gerald Arnold LUBENOW, Appellant.

No. 49802.

Supreme Court of Minnesota.

Sept. 4, 1981.

C. Paul Jones, Public Defender and Michael F. Cromett, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., and Richard G. Evans, Sp. Asst. Atty. Gen., St. Paul, Thomas J. Reif, County Atty., Alexandria, for respondent.

Heard before OTIS, KELLY, and WAHL, JJ., and considered and decided by the court en banc.

TODD, Justice.

Defendant, Gerald Arnold Lubenow, was convicted of second-degree murder [1] in connection with the death of Roseleen Peterson after a trial by jury in Douglas County District Court. He was sentenced to an indeterminate term of imprisonment not to exceed 40 years. Appellant challenges his conviction on several grounds, including the sufficiency of the evidence and the admission into evidence as dying declarations certain incriminating responses of Mrs. Peterson to questions put to her before her death. We reverse.

The record reveals that at approximately 7:15 a. m. on February 12, 1974, Roseleen Peterson was found unconscious along a rural road about 7 miles north of Alexandria, Minnesota. She was only partially clothed and nearly frozen. She was taken to the Douglas County Hospital where it was determined that she had no discernible blood pressure, and her body temperature was below 80° F. A tube was inserted to help her breathing, and her body was immersed in warm water. Once her body temperature began to rise, heavy bleeding was discovered. She was taken to the operating room where the surgeon found that she had been assaulted at least three times with a sharp instrument through her vagina, into her small bowel, colon, liver, diaphragm, and into her right lung. The surgeon described the instrument causing the puncture wounds as long, narrow, and very sharp, about 20 to 23 inches long, and the diameter of a pencil. There were also bruises on her neck, apparently caused by an attempted strangulation.

After 6 hours of surgery, Mrs. Peterson was taken to the intensive care unit where she received blood and was carefully watched. She became conscious for the first time at approximately 7 o'clock that evening. Her doctor, after determining that she was "alert and knew what was going on," called the sheriff to come to the hospital if he wished to ask her questions. Sheriff Howard Urness and Agent Mickey Wellnitz from the State Crime Bureau arrived at the hospital at 7:30 p. m. They found Mrs. Peterson in the company of a Catholic priest who was talking to her. When the priest left, they entered Mrs. Peterson's room, introduced themselves, and told her they were trying to discover the identity of the person who had assaulted her. She could not speak or write. When asked if she understood, she nodded her head "yes." She was asked whether only one person had assaulted her, to which she nodded "yes." Sheriff Urness and Agent Wellnitz testified that Dr. Joseph Merickel told her she was going to die. Agent Wellnitz asked her if she knew that she would be in danger of "hellfire" if she died "with a falsehood on her lips" and that a nod of her head would be as much a false-

---

1. Minn.Stat. § 609.19 (1980) provides:
   Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years.

hood as if she had actually spoken, to which she nodded her head "yes." Then either Wellnitz, Urness, or the doctor asked Mrs. Peterson the following questions, to which she either nodded "yes" or shook her head "no":

Q. Can you tell us who did [this to you]? A. Yes.

Q. Was it John? A. No.

Q. How old was he, between 20 and 30? A. Yes.

Q. Between 20 and 25? A. No.

Q. Between 25 and 30? A. Yes.

Q. What was the color of his hair, was it black? A. No.

Q. Was it brown? A. No.

Q. Was his hair long? A. Yes.

Q. Was it your husband? A. No.

Q. Was it Freddie Schlosser? A. No.

Q. Do you know Freddie? A. Yes.

Q. Was his name Jerry? A. Yes.

Q. Was it Jerry Rupert? A. No.

Q. Do you know Jerry Rupert? A. Yes.

Q. Was he from the Alexandria area? A. Yes.

Q. Was he from the Alexandria area but not in town? A. Yes.

Q. From in the country? A. Yes.

Q. By a lake? A. Yes.

Q. Is he married? A. Yes.

Q. His name is Jerry from Alexandria but not in town, he is married and lives by a lake? A. Yes.

Q. Was his last name a Scandinavian name? A. No.

Q. Do you know his last name? A. No.

Q. What kind of car was it, was it a red car? A. No.

Q. Was it a green car? A. No.

Q. Was it a blue car? A. Yes.

Q. Was it a truck? A. No.

Q. Was it a pickup truck? A. No.

Q. It was a blue car, right? A. No.

Q. Not a blue car? A. No.

Q. Do you know what color the car was? A. No.

Q. You don't know what color the car was? A. No.

Q. Did you meet him at the liquor store? A. No.

Q. Did you meet him at the Hideout? A. No.

Q. Did you meet him in the Hideout by prior arrangement? A. Yes.

Q. Did you meet him at Club Reno? A. No.

Q. Did you go to Club Reno? A. No.

Q. Did you ever meet this person before? A. Yes.

Q. Have you gone out with this person before? A. No.

Q. This is the first time you had been out with him? A. Yes.

Q. Do you know Jerry Rupert? A. Yes.

Q. Was this the person that did it to you? A. No.

Q. Was it Jerry? A. Yes.

Q. Not John? A. No.

Q. Was it Joe? A. No.

Q. Jerry, right? A. Yes.

The law enforcement officers left the hospital, did some investigating, and returned at approximately 10:10 p. m. to further question Mrs. Peterson. They asked if she knew who they were, and she nodded her head "yes." Then they asked her the following questions:

Q. Was it Jerry Lubenow that [did this to you]? A. No.

Q. Do you know Jerry Lubenow? A. No.

Q. Did you go to the VFW? A. Yes.

Q. Do you know his last name? A. No.

Q. Was it a convertible? A. No.

Q. Do you know the color of the car? A. No.

Q. Do you know the kind of car? A. No.

At approximately 11 a. m. on February 13, 1974, Sheriff Urness and Agent Wellnitz returned to the hospital with a picture of the defendant. A nurse was present during this interview. The officers asked Mrs. Peterson if she remembered them, and she nodded "yes." She was asked if she could

look at a photograph to see if she could identify her attacker, and she nodded "yes." A picture of the defendant was held up by Agent Wellnitz for her to see, and either the nurse or Mrs. Peterson or both moved his hand so as to give her a clearer view. Mrs. Peterson was asked whether it was Jerry, and she shook her head "no." She was then asked if she could see the picture, to which she shook her head "no." She appeared frustrated by being unable to talk, and Agent Wellnitz said "[t]ake it easy, then you will be able to talk in the future," to which she nodded "yes." She was also asked the following questions:

Q. Did you leave the VFW with Jerry?
A. Yes.

Q. Did you go to the motel with him?
A. No.

Q. Did you just meet him at the Hideout? A. Yes.

Mrs. Peterson usually wore glasses at all times, but she was found without them, and they were never subsequently recovered. Her eyes on February 13 were swollen; one of them was almost closed. Sheriff Urness testified that she looked stronger on February 13 than on February 12, but Dr. Merickel testified that from the time she regained consciousness after surgery, her condition steadily deteriorated, and she was developing kidney failure. On February 15, she was transferred to Hennepin County General Hospital so that she could be placed on a dialysis machine. She died on February 17 from bronchial pneumonia, secondary to the injuries she received in the assault.

Defendant was originally arrested for the crime involved herein on February 13, 1974. On April 2, 1974, the Douglas County Grand Jury returned a "no bill" on the charge of first-degree murder against defendant. Four years later, the charge against defendant was resubmitted to the grand jury, even though no new evidence had been revealed in the intervening years. On June 21, 1978, the grand jury returned an indictment against defendant. Defendant was finally brought to trial on this charge on November 7, 1978, over 4½ years after he was originally arrested.[2] Having concluded that defendant was denied a fair trial and that the evidence was insufficient to sustain defendant's conviction for second-degree murder, we reverse the defendant's conviction.

1. The state's case rests primarily on the nonverbal responses of the victim to questions put to her by police officers. These responses were admitted as "dying declarations" under Minn.R.Evid. 804(b)(2). Under Rule 804(b)(2), such statements are admissible only if made while the declarant believes that his or her death is *imminent*. In *State v. Elias*, 205 Minn. 156, 285 N.W. 475 (1939), this court admonished that in order for such statements to be admissible, something more is required than that the declarant is aware of the seriousness of his injuries and possibility of death. It must be

---

2. We are concerned that the state allowed 4 years to pass before again bringing the defendant before the grand jury, particularly in light of the fact that no new evidence was discovered during that time. We recognize that there is no statute of limitations for the crime of murder, *see* Minn.Stat. § 628.26 (1980), and that in cases where new evidence was found it would be proper for the state to resubmit a charge to the grand jury a number of years after a no bill had been returned on that charge. In this case, no additional evidence was presented to the grand jury.

In addition, the indictment of the defendant 4 years after his arrest is contrary to the provision of Minn.Stat. § 611.04 (1978), applicable at the time of defendant's arrest but now repealed. That section provides in pertinent part:

When any person has been held to answer for a public offense, if an indictment is not found against him at the next term of court to which he is held, the court shall order the prosecution to be dismissed, unless good cause to the contrary is shown.

Minn.Stat. § 611.04 (1978), repealed by 1979 Minn. Laws, ch. 233, § 42.

A 4-year delay between arrest and indictment is disruptive of the life and freedom of an accused because he must live with the uncertainty of whether he will be brought to trial. Furthermore, such a delay results in loss of evidence or witnesses and loss of memory concerning the events in question which in turn could decrease the fairness of a trial.

shown that the declarant was in actual danger of death and had lost all hope of recovery. Because of the dangerous nature of dying declarations, the prerequisites to their admission must be clearly established. The state of mind of the declarant is the key to admissibility and thus, this state of mind must be shown by competent evidence and must not be left to speculation and conjecture. *State v. Elias*, 205 Minn. at 159, 285 N.W. at 477. To the foregoing principles which have been established by this court, we would add that special care must be taken in determining the admissibility of such statements where leading questions are used to determine the declarant's state of mind because inherent in such a procedure is the risk that the questioner may inaccurately express the declarant's true state of mind. *See generally* 53 A.L. R.3d 785, 796, § 4b (1973), and cases cited therein.

■ While there was evidence in the record that a doctor had informed the victim that her condition was serious and that she might die, the doctor's statement only informed the victim of the possibility of death. The victim was given no indication of the certainty of death resulting from her injuries. Furthermore, although the record reflects that the victim's condition was serious at the time of the questioning, there was no indication in the record that the victim was in actual danger of death at the time. To repeat the admonishment of *Elias*, something more than the seriousness of the victim's injuries and the possibility of death must be shown to make statements admissible as dying declarations.

The evidence fails to make the required showing that the victim believed that she was in imminent apprehension of death. The fact of a priest's presence prior to the questioning of the victim is not at all indicative of the victim's state of mind. Furthermore, other facts indicate that the victim did not believe in her impending death at the times that the investigators questioned her. There was evidence that the victim's condition was "stable" at these times and that the victim looked stronger at the interview on February 13. The victim was told at the February 13 interview to "take it easy" so that she would be able to talk in the future. Thus, the evidence does not support the conclusion that the victim believed her death was imminent, and such a conclusion can only be reached through conjecture. We therefore hold that the "statements" were improperly admitted into evidence as dying declarations.

■ 2. The defendant claims that the hunting arrows found in his car were improperly admitted into evidence. Under Minn.R.Evid. 402, only "relevant" evidence as defined by Minn.R.Evid. 401 is admissible. The relevance of physical evidence was determined in two cases, *State v. Olek*, 288 Minn. 235, 179 N.W.2d 320 (1970), and *State v. Kotka*, 277 Minn. 331, 152 N.W.2d 445 (1967), *cert. denied*, 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968). In *Olek*, this court stated that physical objects which *are connected* to a crime are admissible. This court determined in *Kotka* that proof that the defendant possessed a weapon with which the crime *was committed* is sufficient to render the weapon admissible. The proof concerning the arrows in this case satisfies neither the test of *Olek* nor *Kotka*. There was no showing that the arrows were in any way connected with the crime which is the subject matter of this prosecution. In fact, the available evidence requires the contrary conclusion. The evidence indicates that tests performed on the arrows revealed that there was no blood or other body fluids on them. Furthermore, it was not shown that the crime was committed by use of arrows. A doctor testified that he thought the victim's injuries could have been made by arrows. However, it was conceded at trial that any number of other instruments could also have made the injuries. The admission of the arrows at trial impermissibly suggested to the jury that the crime was committed with arrows which were in the defendant's possession. There is no basis for the making of these inferences. Therefore, we hold that the arrows were not relevant and were improperly admitted at trial.

■ 3. The evidence presented at trial was not only insufficient to sustain the defendant's conviction beyond a reasonable doubt but is consistent with his innocence. The tire tracks found at the scene of the commission of the crime were not connected to defendant's car or any other car to which he had access. An analysis of both the victim's and defendant's automobiles revealed no link between the vehicles and the assault. A search of defendant's motel room failed to reveal anything connecting defendant with the crime. Despite the brutal and bloody nature of the assault, no bloodstained clothing was found in defendant's possession, and there were no scratches or other marks on defendant's body. There was no testimony by those who saw defendant just after the crime was apparently committed that there was any blood on him or that he acted in other than a normal manner.

As previously stated, the victim's responses to leading questions put to her by the investigators were improperly admitted as dying declarations. What little could be determined from the victim's nonverbal responses, however, does not support a finding that the defendant was the assailant. The victim described her attacker as "Jerry" who was between 25 and 30 years old, had long hair, lived outside of Alexandria, and was married. Defendant's first name is Jerry. He was 27 years old at the time of the incident, and was married, although separated from his spouse. However, there was testimony that defendant had short hair and had for some months lived in Alexandria. When asked whether it was defendant who had assaulted her and whether she knew defendant, the victim responded in the negative. When shown a picture of defendant and asked whether the person in the picture was "Jerry", the victim again responded in the negative.

Other responses given by the victim to questions put to her are inconsistent with the theory that defendant assaulted the victim. The evidence indicates that the victim met defendant in a liquor store the afternoon of the assault and had a drink with defendant at the VFW Club that evening.

Neither defendant nor the victim were seen at the Hideout Bar that evening. However, in response to questioning, the victim indicated that she had not met her assailant in a liquor store but had met him at the Hideout by prior arrangement.

Other circumstantial evidence is consistent with a rational hypothesis supporting defendant's innocence rather than his guilt. Defendant testified that, on the evening of the assault, he met the victim at the VFW Club, drank with her, and later left the club together. Defendant testified further that he then drove along to the motel where he was residing and that the victim followed him to the motel in her own car. He stated that the victim stayed there for about 1 hour during which time he and the victim talked and had intercourse, and then the victim left the motel alone. Defendant testified that that was his last contact with the victim, and subsequent to parting with the victim, he proceeded to the Eagles Club. Circumstantial evidence supporting defendant's testimony includes the following: defendant and the victim were seen together at the VFW Club; a woman matching the description of the victim was later seen at the motel entering defendant's room; a car matching the description of the victim's car was seen at the motel; such a car being driven by a woman was later seen leaving the motel parking lot and moving toward downtown where the Hideout Bar was located and where the victim's car was eventually found; defendant was seen at 12:30 a. m. at the Eagles Club. Thus, the evidence supports a theory that after the victim left the defendant, she proceeded to the Hideout Bar where she met an individual other than the defendant who subsequently assaulted her. The evidence therefore is not sufficient beyond a reasonable doubt to sustain defendant's conviction.

■ 4. Other errors were committed at trial which served to deny defendant a fair trial. Although it may have been entirely proper for the trial court to allow a rereading of certain testimony to the jury, the rereading was conducted in an impermissi-

ble and prejudicial manner. A portion of the selected testimony was omitted during the reading, and the omitted portion was supportive of defendant's case. Furthermore, testimony which was stricken from the record was reread to the jury. Additionally, prosecutorial misconduct in the form of comments on the credibility of the evidence occurred during final argument. Each of these errors, when considered separately, may not have been highly prejudicial. However, when the errors are considered cumulatively and are viewed in the context of the dearth of evidence supporting defendant's guilt, it is apparent that the errors were highly prejudicial and served to deny defendant a fair trial.

Reversed.