**STATE of Minnesota, Respondent,**

v.

**Tracy Alan ZORNES, Appellant.**

**No. A12–0463.**

Supreme Court of Minnesota.

May 31, 2013.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, Saint Paul, MN; and Brian Melton, Clay County Attorney, Moorhead, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Tracy Alan Zornes was convicted of the first-degree premeditated murders of Megan Londo and John Cadotte, arson for setting a fire that destroyed the apartment building where Londo and Cadotte were murdered, and theft of Cadotte's car. On direct appeal, Zornes argues that the district court committed four reversible errors. First, Zornes argues that the court's removal of two persons from the courtroom during voir dire violated his right to a public trial under the United States and Minnesota Constitutions. Second, he argues that the court violated his Fourth Amendment rights when it admitted a statement Zornes made to the police that he claims was made during an unlawful search. Third, Zornes argues that the court abused its discretion when it admitted into evidence several items that were found when Zornes was arrested. Finally, Zornes argues that the court abused its discretion when it ruled that, if he chose to testify at trial, the State could attempt to impeach him using three prior felony convictions. Because we conclude that none of the alleged errors requires reversal, we affirm.

In February 2010, 25–year–old Megan Londo was trying to stay clean and to regain custody of her children. She was also contemplating a move from Naytahwaush to Moorhead so that she could be closer to her children. After Londo had a physical altercation with one of her family members, Londo's fiancé arranged for her to stay with his sister, C.C., in Moorhead. The apartment building where C.C. and her boyfriend, S.G., lived consisted of three apartment units: C.C. lived in a unit that occupied the entire lower-level of the building; "C." and his girlfriend, S.P., lived in one of the two upstairs apartments; and J.M. and his 2–year old daughter lived in the other upstairs apartment. Londo moved in with C.C. by the middle of February 2010.

On Thursday, February 18, 2010, S.G. learned that the police were seeking to arrest him for a probation violation stemming from a felony DWI conviction. Thus, S.G. decided to flee to Wahpeton, North Dakota, where his parents lived, but he did not have a car, so he asked John Cadotte to give him a ride in Cadotte's red Honda Civic. Cadotte was willing to provide rides for people, usually in return for some gas money. Sometime that evening, Cadotte drove S.G., C.C., and Londo to Wahpeton. Because Cadotte was planning to hang out with a friend near C.C. and S.G.'s apartment later that night, he asked for permission to stay at their apartment if he decided to drink. When S.G. and C.C. were dropped off in Wahpeton, Londo was entrusted with possession of the only key to C.C.'s apartment. While traveling back to Moorhead, Londo used Cadotte's cellphone to contact a friend in an attempt to acquire some prescription pain pills.

That same evening, Londo was looking for transportation to Naytahwaush. A mutual acquaintance connected Londo with Zornes, who was staying in Moorhead with E.M., his on-again, off-again girlfriend. Apparently things were not going well between Zornes and E.M., so Zornes used E.M.'s cellphone to contact a female friend, S.B., in an attempt to arrange a

ride back to his home in Naytahwaush. S.B. also happened to be a friend of Londo's. S.B. attempted to find a ride for Zornes but she was unable to do so. During these conversations, Londo also said that she was looking for a ride home to Naytahwaush.

In a subsequent conversation, Zornes told S.B. that his sister had agreed to give him a ride to Naytahwaush. Knowing that Londo was also looking for a ride there, S.B. asked Zornes if Londo could ride with him and Zornes said that was fine. S.B. then gave Londo E.M.'s cellphone number so that Londo could contact Zornes. At 9:08 p.m., a call was placed from Cadotte's cellphone to E.M.'s cellphone. Shortly after 9:08 p.m. on February 18, Zornes abruptly left E.M.'s apartment. When he left the apartment, Zornes took with him a tote bag containing beadwork and a duffel bag filled with clothing. E.M. testified that she was upset about Zornes's abrupt departure, and as a result she took "[q]uite a few" pills, including between 10 and 12 Ambien and Tylenol PM.

About an hour later, at approximately 10:00 p.m., Zornes was seen with Londo and Cadotte in the parking lot of C.C.'s apartment building. More specifically, J.M.'s then-girlfriend saw two men and one woman get out of a small red car and go into C.C.'s apartment. The girlfriend observed that one of the men was carrying a duffel bag. Her description of the man carrying the duffle bag matched Zornes's appearance, and her description of the small red car was consistent with the red Honda Civic owned by Cadotte. J.M.'s girlfriend later saw a photo of Zornes on the Internet and testified at trial that she recognized him right away as the man that she had seen in the parking lot.

Around 11:50 p.m., E.M. received a text message from Cadotte's cellphone—a number that she did not recognize. The text

was an inquiry if she was interested in purchasing 100 10–milligram pills. E.M. assumed the pills contained hydrocodone. Because E.M. did not recognize the cellphone number of the phone that was being used to send the text, she asked who the sender was and received the initials "T.Z." E.M. testified that she understood "T.Z." to mean Tracy Zornes, the only person she knew with those initials. Following this initial exchange, there were many telephone calls and text messages exchanged between Cadotte's and E.M.'s cellphones, but a police detective testified that the phone records indicated the people using the two cellphones were not able to reach each other. E.M. testified that, because she had taken several pills after Zornes left her apartment, she did not remember any of the events from that night or from the early hours of the next morning.

The three apartments in C.C.'s building all shared the same ventilation system, and S.P. testified that the residents shared "everything, every noise, everything." In the early morning hours of February 19, the upstairs residents heard a lot of noise from the downstairs apartment. The noise included "a lot of arguing," music, and the sounds of a small party or "get together." C. and J.M. both testified that they did not think much of the noise because there was frequently arguing in the downstairs apartment. C. testified that he heard the sounds of two male voices and one female voice, while J.M. testified that he heard the sound of one male voice "talking and talking and talking and talking." J.M. said that he could not sleep that night and so he spent much of the night on his computer and looking out of a window in his apartment. While looking out the window, J.M. saw a man wearing a black coat and a hat make two trips in and out of the downstairs apartment and walk along the trail to the parking lot. J.M. said that

during at least one of those trips the man was carrying something.

Both C. and J.M. testified that, early in the morning, they heard sounds from the downstairs apartment that sounded like people having sex. S.P., C., and J.M. also all heard what they described as loud banging or a series of loud smacks. J.M. described the noise as "like a wiffle ball bat hitting a leather couch," and C. described it as "like somebody beating on something." Again, the upstairs neighbors did not think much of the noise because the downstairs residents were often arguing or being disruptive. J.M. testified that at about 6:30 or 6:45 a.m. he saw the same man he had seen walking to the parking lot earlier leave from the downstairs apartment, this time for good.

At about 7:00 a.m., various signs alerted the upstairs residents that there was a fire in the building: S.P. said she awoke to the sound of the carbon monoxide alarm in her apartment; C. felt the floor beneath him get very hot; and J.M. smelled smoke and saw his apartment filling with smoke from the vents. Firefighters were dispatched to the building at 7:07 a.m. J.M. was able to grab his daughter and escape through the heavy smoke, but the fire department had to rescue C. and S.P. Firefighters found that the door to the downstairs apartment was locked so they kicked it in. The apartment was full of smoke, but as the smoke cleared, firefighters found two bodies that were later identified as John Cadotte and Megan Londo. Cadotte's body was on the floor in the living room and Londo's body was on a bed in the bedroom.

The medical examiner who examined the victims determined that the cause of death for both Cadotte and Londo was "multiple blunt and sharp force injuries." Cadotte was struck approximately 21 times in the head by a heavy, blunt object, and had multiple stab wounds stabbed to his back, at the base of his neck, and in his ears. Cadotte also had multiple circular lacerations, consistent with a chair leg or a hammer.

Using overlays of Cadotte's wounds, the medical examiner determined that, given the shape of the injuries and the force of the impact, Cadotte's wounds were most likely inflicted with a claw hammer. The medical examiner concluded that Londo's skull had been struck with significant force, such that the examiner compared the trauma to what is typical for "falls from a great height or motor vehicle collisions." Londo had been stabbed in her heart by a single-edged blade, as well as stabbed in her ears.

The medical examiner was able to determine that neither Londo nor Cadotte was alive when the fire started, but Londo's body was significantly damaged by the fire. The medical examiner administered tests on Londo to determine whether a sexual assault had occurred; testing showed no foreign saliva or semen. Investigators did not find any smoke detectors in the apartment, but identified a place in the apartment's bedroom where it appeared that a smoke detector had been removed from the wall.

There is no statement or testimony from Zornes in the record. But Zornes's whereabouts at the time of the fire can be at least partly ascertained through his statements to acquaintances who later spoke with the police or testified at trial. Zornes's statements to these acquaintances place him at or near C.C.'s apartment until the start of the fire. In the days after the fire, Zornes gave varying accounts to acquaintances about the events on February 18 and 19. Zornes's differing accounts included: that another person started the fire and Zornes barely escaped by getting out through a window; that he

went to the apartment building to pick up Londo and was outside when he saw the fire start; that he had been partying with Cadotte and Londo at the apartment, but it was "getting loud" so he went out to Cadotte's car to listen to the radio, then fell asleep only to wake up and see the fire after it was "too late"; and, again, that he had pulled up outside the apartment after the fire had already started.

The day after the fire, February 20, S.W., Zornes's nephew, returned to his home in Naytahwaush. Upon his return, S.W. saw a red car that he did not recognize parked outside of his home. This car was later determined to be Cadotte's red Honda Civic. When S.W. entered his home later in the afternoon, he was surprised to discover his uncle—Zornes—was in the home. Zornes gave S.W. an account of the fire at C.C.'s apartment, stating that he was "scared" and that he had "seen a fire" and "was outside" when the fire started. Because Londo was from Naytahwaush, word had already reached the community about the fire and Londo's death, so S.W. already knew about the fire. S.W. did not know about Cadotte at that time or any details about the victims' deaths.

Zornes remained at S.W.'s home while S.W. left for a while. Upon his return, S.W. informed Zornes that he had seen the police in the area. Zornes then asked S.W. if the two of them could "get out of here" and if S.W. could help him find some gas. After S.W. provided a gas can, the two of them drove away in different vehicles. Zornes was in the lead, driving Cadotte's Honda Civic, and S.W. was following, driving his own vehicle. Zornes drove out to the middle of the country, pulled off on a dirt road, and then set fire to Cadotte's Honda Civic using the gas from the can that S.W. had provided. S.W. later testified that he was "scared" at this time. After gathering some supplies, Zornes had S.W. drive him to a remote wooded area in rural Mahnomen County, where Zornes got out of S.W.'s vehicle and said, "Well, I'm just going to stay here then." Zornes then walked off into the wooded area.

Months later, one of S.W.'s sisters found items hidden in a closet at S.W.'s home that C.C. identified as belonging to her. C.C. testified that she had stored the items in the bedroom closet in her apartment before she traveled to North Dakota the day before the murders and the fire. The implication of C.C.'s testimony was that Zornes stole the property from C.C.'s bedroom closet and then hid it in S.W.'s Naytahwaush home during his flight from the police.

On Sunday, February 21, a passerby found the burnt remains of Cadotte's Honda Civic. The police were called, and during the subsequent processing of the car, investigators recovered the remains of a smoke detector. By that time, police investigators had also obtained the victims' cellphone records and noted the extensive contacts between Cadotte's cellphone and E.M.'s cellphone on the night of the murders. There were up to thirty-five calls between the two phones.

The police interviewed E.M. and, based on information from E.M. and the phone records, they made a connection between Zornes and the murders. The police then identified Zornes as a "person of interest." The police began to search for Zornes and interviewed S.W. twice on February 21, the same day that the passerby reported finding the remains of Cadotte's car. During the interview with S.W., the police learned about Zornes's involvement in the burning of Cadotte's car. The police then intensified their search for Zornes, but were unable to locate him for approximately two weeks. During that time, Zornes apparently received additional supplies from several friends and family members.

Zornes told one friend that he "felt bad" for Londo's family, but that Zornes could not contact any family members because there was an unrelated outstanding warrant for his arrest. Zornes did in fact have outstanding warrants for his arrest that had been issued by Becker County authorities.

On March 4, 2010, police investigators persuaded one of Zornes's friends, who had been helping Zornes while he was hiding from the police, to reveal Zornes's location to them. After some difficulty given the remote nature of the hiding place, the police were able to locate Zornes at a makeshift campsite in a wooded area and arrested him. During a routine pat down search of Zornes conducted as part of this arrest, the police recovered a folding knife. The police also recovered a hammer, screwdriver, utility knife, and scissors from Zornes's campsite. Zornes was then taken to the Mahnomen County Law Enforcement Center. While Zornes was being transported from the campsite, the police officers told him that he was being taken to the law enforcement center so that they could collect evidence and that "after collecting evidence law enforcement would get a search warrant."

After arriving at the law enforcement center, Bureau of Criminal Apprehension (BCA) Special Agent Eric Jaeche and Moorhead Detective Ryan Nelson began to examine Zornes. Zornes was first given a *Miranda* warning. Zornes invoked his *Miranda* rights after receiving the warning and the questioning was halted immediately. Jaeche and Nelson then "processed" Zornes. This processing included: itemizing his clothing; examining his body for any injuries, cuts to the hands, or other defensive injuries; and photographing Zornes's body. While processing Zornes, Jaeche and Nelson were speaking with him and telling him what to do, such as which items of clothing to remove. The officers were not discussing the arson or murder charges or interrogating Zornes during the processing.

After processing Zornes, Jaeche told Zornes that they were going to utilize a sexual assault kit to take DNA samples from Zornes's cheek and penis. Zornes frowned when Jaeche made that statement and Nelson testified that he heard Zornes say either "this wasn't anything sexual" or "it wasn't sexual related." Jaeche testified that he did not hear Zornes make any statement "to [him] directly." The investigators collected samples from inside Zornes's cheek and from his penis. Three and a half hours later, the police obtained a search warrant to allow them to take DNA samples from Zornes.

A Clay County grand jury indicted Zornes on two counts of first-degree premeditated murder, two counts of second-degree intentional murder, first-degree arson of a dwelling, and theft of a motor vehicle. Following the indictment, Zornes brought several pretrial and trial motions to suppress much of the evidence against him. More specifically, he sought to suppress: the results of all evidence obtained from him during Jaeche and Nelson's March 4, 2010 search; the results of the DNA testing using the samples collected during the search; and his statement made during that search. The district court found that there was no practical reason why the police could not have waited to obtain a search warrant and concluded that none of the exceptions that allow the admission of evidence obtained during a warrantless search applied. The court then suppressed the DNA samples taken from Zornes. However, the court found that Zornes made his statement before being physically touched by the police officers and thus concluded that the search did not begin until Jaeche had physically

touched Zornes to gather the samples. Based on this finding, the court concluded that Zornes's potentially incriminating statement was not part of the unlawful search and would not need to be suppressed.

On September 15, 2011, Zornes brought a motion to limit the admissibility of his prior felony convictions. The district court found that the convictions the State sought to admit were recent enough that they were not barred by statute as being too old, and concluded that mitigating or balancing factors did not require that the convictions be excluded. The court then allowed Zornes's prior convictions to be admitted for purposes of impeachment.

During jury voir dire on October 19 and 20, the district court excluded E.M. and Cadotte's brother from the courtroom. On October 19, it was pointed out to the court that E.M., who was on the joint witness list, was in the courtroom during voir dire. Without objection, the court ruled that voir dire was part of the trial process and therefore any sequestration of E.M. included voir dire. The court then asked E.M. to leave the courtroom, which she did. The following day, defense counsel asked that Cadotte's brother, who was in the courtroom and also on the joint witness list, be required to watch the proceedings from an observation room "so we don't have the jurors in eye contact with him." Without objection, the court granted the request.

On October 27, Zornes moved to suppress the admission of the folding knife taken from him on the day of his arrest as well as the hammer, utility knife, scissors, and other tools recovered from his campsite. Zornes asserted that because the items were not sufficiently connected to the scene of a crime, they were not relevant and should be excluded from evidence. The following day the district court held a hearing on this motion and ruled from the bench that the items could be admitted into evidence. The court reasoned that the proper weighing of the items' relevance and connection to the crime scene was a question that belonged to the jury.

Zornes's jury trial lasted until November 9, when the jury found Zornes guilty of: the first-degree premeditated murder of Megan Londo, in violation of Minn.Stat. § 609.185, subd. (a)(1) (2012); the first-degree premeditated murder of John Cadotte, in violation of Minn.Stat. § 609.185, subd. (a)(1); first-degree arson, in violation of Minn.Stat. § 609.561, subd. 1 (2012); and theft of a motor vehicle, in violation of Minn.Stat. § 609.52, subd. 2(17) (2012). The jury found Zornes not guilty on both charges of second-degree murder. The district court then convicted Zornes and, on December 16, sentenced him to two consecutive life sentences without the possibility of parole for the two first-degree premeditated murder convictions, a consecutive 48–month sentence for the arson conviction,[1] and a 30–month sentence for the motor-vehicle theft conviction to run consecutive with the other sentences.

Zornes raises four issues in his direct appeal to our court. First, Zornes argues that the district court's removal of two persons from the courtroom during voir dire violated his right to a public trial under the United States and Minnesota Constitutions. Second, he argues that the court violated his Fourth Amendment rights when it admitted a statement he

---

1. The court found "substantial and compelling reasons" for departing from the sentencing guidelines by imposing a consecutive, rather than a concurrent, sentence for the arson. The court stated that "[t]his arson is, beyond any doubt, the most serious crime of arson that has ever occurred before this Court."

made to the police that he claims was made during an unlawful search. Third, Zornes argues ·that the court abused its discretion when it admitted into evidence several items that were found with him when he was arrested. Finally, Zornes argues that the court abused its discretion when it ruled that, if he chose to testify at trial, the State could attempt to impeach him with three prior felony convictions. We consider each issue in turn.

## I.

Zornes first argues that the policies underlying sequestration orders do not apply to voir dire and therefore the unwarranted removal from the courtroom of E.M. and Cadotte's brother violated his constitutional right to a public trial. We disagree.

Zornes cites a United States Supreme Court holding that, before a court hearing can be closed to members of the public, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced." *Waller v. Georgia,* 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The Court has "made it clear" that a defendant's Sixth Amendment right to a public trial extends to the states. *Presley v. Georgia,* 558 U.S. 209, 212, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010) (citing *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)). Zornes further cites the recent Supreme Court decision in *Presley* in which the Court concluded that the right to a public trial extends to voir dire. *See id.* at 213, 130 S.Ct. 721. But, the Supreme Court has said that witnesses may be excluded from a courtroom, and that "exclusion of witnesses from [the] courtroom [is] a time-honored practice designed to prevent the shaping of testimony by hearing what other witnesses say.'" *Perry v. Leeke,* 488 U.S. 272, 281 n. 4, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) (quoting *United States*

*v. Johnston,* 578 F.2d 1352, 1355 (10th Cir.1978)). We have held that the ability to sequester witnesses "rests in the sound discretion of the trial court." *State v. Garden,* 267 Minn. 97, 112, 125 N.W.2d 591, 601 (1963).

▮ The sequestration issue raised by Zornes is a question of constitutional law and we review questions of constitutional law de novo. *State v. Bobo,* 770 N.W.2d 129, 139 (Minn.2009) (citing *State v. Mahkuk,* 736 N.W.2d 675, 684 (Minn.2007)). But we have also held that a district court has "substantial discretion in conducting voir dire" and will not be reversed absent an abuse of discretion. *State v. Chambers,* 589 N.W.2d 466, 474 (Minn.1999); *see also State v. Jackson,* 770 N.W.2d 470, 486 (Minn.2009). The Supreme Court has held that trial judges have "broad power to sequester witnesses before, during, and after their testimony." *Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). Thus, the extent of Zornes's Sixth Amendment right to have a public trial is reviewed de novo, but determining whether the conduct of the court during voir dire fell within the contours of that right is a question that we review for an abuse of discretion.

The question of whether a defendant's Sixth Amendment rights allow a court to exclude either a member of the general public or a potential witness from the courtroom during voir dire is a question of first impression for our court. While there is some overlapping analysis between the exclusion of E.M. from the courtroom and the assignment of Cadotte's brother to an observation room, the circumstances are distinct enough that we will consider each event separately.

### 1. *E.M.*

E.M. was Zornes's girlfriend and was potentially a significant witness at trial.

In fact, E.M. played a key role in Zornes's planned alibi defense. E.M. attended voir dire on October 18 and then again on October 19. E.M. was on the joint witness list prepared by both sides. On October 19, counsel brought to the district court's attention the fact that a potential witness was in the courtroom.[2] The court stated that witnesses were to be excluded during the trial process and that because the court "determined that voir dire selection is part of the trial process [the court] cannot allow any potential witnesses to be present." The court went on to note that excluding witnesses from voir dire "is an intricate and complex legal issue that, frankly, we haven't researched before, but, it's [the court's] judgment that the safest thing to do is to order all witnesses sequestered throughout the voir dire process and the trial." E.M. was then excluded from the courtroom for the remainder of the voir dire proceedings.

In *Presley,* the Supreme Court made clear that courtroom closure is a serious issue that, absent a specific finding by a district court can lead to the violation of a defendant's Sixth Amendment rights. 558 U.S. at 213–14, 130 S.Ct. 721. We acknowledge and agree with this strong statement by the Supreme Court regarding a defendant's Sixth Amendment right to a public trial. But the Court's holding in *Presley* does not support Zornes's argument because the exclusion of E.M. is distinguishable from the facts in *Presley.* The exclusion of E.M. is more similar to the facts in another Supreme Court case, *Leeke,* and one of our cases, *Garden. See Leeke,* 488 U.S. 272, 109 S.Ct. 594; *Gar-*

*den,* 267 Minn. 97, 125 N.W.2d 591. The key difference between *Leeke* and *Presley* is that *Leeke* dealt with the exclusion of a defendant *in his role as witness* and *Presley* dealt with the exclusion *of the public. Compare Leeke,* 488 U.S. at 282, 109 S.Ct. 594 (allowing the district court to restrict a defendant from speaking with his counsel if the court concluded such conversation risked tailored testimony), *with Presley,* 558 U.S. at 212, 130 S.Ct. 721 ("[T]he *voir dire* of prospective jurors must be open to the public. . . ."). Here, when E.M. was excluded from the courtroom she was a potential witness, which makes her distinct from the "public" generally and places her in the class of persons over whom district courts have broad discretion to exclude from the courtroom. As we have previously stated, "while discretionary, in practice sequestration [of witnesses] is rarely denied in criminal cases and rarely should be denied." *State v. Posten,* 302 N.W.2d 638, 640 (Minn.1981).

The public policy most often articulated for sequestering witnesses is preventing some witnesses from tailoring their testimony in response to hearing the testimony of other witnesses. As the Supreme Court has said, "witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say." *Leeke,* 488 U.S. at 281, 109 S.Ct. 594. We have echoed the logic behind excluding witnesses by saying that "[t]he basic reason for sequestration of witnesses, of course, is to remove any possibility that a witness waiting to testify may be influenced." *State v. Ellis,* 271 Minn. 345, 364, 136 N.W.2d 384, 396 (1965).

---

2. In its brief, the State asserts that Zornes's counsel brought this matter to the court's attention. However the record does not fully support this assertion. The trial transcript quotes defense counsel as saying that "I think counsel want to approach for an issue that is not related to Mr. Miller if we could." Fol-

lowing this statement by defense counsel, an off-the-record bench conference was held. Defense counsel's reference to trial counsel is in the plural and also refers to "we"—the implication being that this is a matter both sides were ready to discuss.

Zornes highlights this public policy but then attempts to distinguish it by arguing that allowing witnesses at voir dire cannot thwart this objective and, therefore, excluding witnesses during voir dire is the same as excluding the public from voir dire.

But the questioning of prospective jurors at voir dire can be wide ranging and cover details of trial strategy, and we have stated that "[t]he scope of voir dire is committed to the district court's sound discretion." *State v. Carridine*, 812 N.W.2d 130, 147 (Minn.2012) (citation omitted) (internal quotation marks omitted). The public policy aims of voir dire and witness sequestration therefore are not at odds—it is conceivable that a witness could tailor his or her testimony in response to what is overheard during voir dire. We conclude that the district court is best suited to protecting the integrity of the trial process by managing witnesses and the content of voir dire as the court sees fit. In order to find error on this issue, we would need to conclude that the district court abused its discretion by excluding E.M. from the courtroom—a high bar for Zornes to meet in light of the discretion courts have on these issues.

■ Based on the Supreme Court's holding in *Leeke* and our holding in *Garden,* a district court has substantial discretion to sequester witnesses from the trial process. The Supreme Court held in *Presley* that voir dire is part of the trial process. Applying those holdings to the facts of this case, we conclude that the sequestration of E.M. fell within the bounds of the district court's discretion. *See Presley,* 558 U.S. at 213–14, 130 S.Ct. 721; *Leeke,* 488 U.S. at 281–82, 109 S.Ct. 594. Therefore, we hold that the district court did not violate Zornes's constitutional right to a public trial when it sequestered E.M. from voir dire.

### 2. *Cadotte's Brother*

The circumstances leading to the removal of Cadotte's brother from the courtroom and his placement in an observation room are more complicated than the sequestration of E.M. The day after the district court sequestered E.M., Zornes's trial counsel alerted the court to the fact that Cadotte's brother was in the courtroom during voir dire. At the time, the brother was on the witness list. Zornes's trial counsel stated that it was his "understanding that the state may be willing to remove [the brother] from [the witness] list and in return we would not be objecting if [the brother] wants to watch from the observation room so we don't have the jurors in eye contact with him." The State agreed to this proposal, removed the brother from the witness list, and allowed him to watch the trial proceedings from an observation room.

■ We have held that not all courtroom restrictions implicate a defendant's Sixth Amendment right to a public trial. *E.g., State v. Lindsey,* 632 N.W.2d 652, 660–61 (Minn.2001). We have identified four factors that lead us to conclude that a courtroom exclusion is too trivial to implicate the Sixth Amendment: (1) the courtroom was never cleared of all spectators; (2) the trial remained open to the general public and the press; (3) there was no period of the trial in which members of the general public were absent during the trial; and (4) at no time was the defendant, his family, his friends, or any witness improperly excluded. *Id.* at 661. After our careful review of the record, we determine that under the four factors from *Lindsey* the removal of Cadotte's brother from the courtroom was trivial. Because we conclude that the removal of the brother was too trivial to implicate Zorne's Sixth Amendment right to a public trial, we need

not, and do not, decide the status of Cadotte's brother as a witness; whether the alleged error was invited by the defendant; to what extent, if any, removal of the brother amounted to a partial courtroom closure; or the significance of his placement in an observation room.

## II.

Zornes claims that the district court erred when it admitted his March 4, 2011 statement that "this wasn't anything sexual" or "it wasn't sexual related." One or the other of these statements were made by Zornes during a search following his arrest. Zornes agrees that the court correctly concluded that the warrantless search of his person was unconstitutional and that the court properly suppressed the DNA test results from samples taken from his cheek and penis during that search. But, Zornes claims that the court erred when it did not suppress the alleged statement he made at that time. Zornes argues that the court erred both factually and legally when it determined that his statement did not occur during the unlawful search. Zornes asserts that the court's finding that his statement occurred before the search began was clearly erroneous because Officer Nelson is the only person who heard the statement and Nelson stated "I don't know if [Zornes's statement] was prior to or during the collection [of the DNA samples from Zornes]."

We have held that a district court's legal conclusions related to a Fourth Amendment search and seizure are reviewed de novo. *State v. Burbach,* 706 N.W.2d 484, 487 (Minn.2005) (citing *State v. Lee,* 585 N.W.2d 378, 382–83 (Minn. 1998)). The court's factual findings are reviewed for clear error, *id.,* but the de novo standard applies to the application of the facts to the Fourth Amendment, *see*

*State v. Lemieux,* 726 N.W.2d 783, 787 (Minn.2007).

After Zornes was arrested at his makeshift campsite, he was brought to the Mahnomen County Law Enforcement Center. Zornes was given a *Miranda* warning and he promptly invoked his right to have an attorney advise him. Zornes was placed in a small holding room and then Jaeche and Nelson explained to him that they would be "collecting some evidence from him at the time" and "would be following up with a search warrant after the collection of the evidence." After the *Miranda* warning was given and Zornes stated that he did not want to talk to the officers, the officers collected Zornes's clothing one item at a time. Nelson then photographed Zornes's body to document any physical injuries. After the photographs were taken, Jaeche obtained some swabs and began the steps needed for a sexual assault test, meaning a swab of Zornes's cheek and genitals. Nelson testified that, after Jaeche proceeded with administering the sexual assault kit, he saw that Zornes "kind of, maybe lowered his eyebrows or just kind of made a look, leading me to believe that he was kind of confused or kind of wondering why." Nelson testified that he then heard Zornes make a comment, "something to the effect, 'It wasn't a sexual thing or sexual related,' something along those lines."

The district court concluded that the collection of the DNA samples constituted an unlawful search and therefore suppressed the test results obtained from those samples. The court carefully reviewed several exceptions that allow admission of evidence obtained without a search warrant, but the court concluded that none of the exceptions applied. Because the State is not contesting the court's conclusion that the search itself was unlawful, and because we conclude

that the court properly considered and rejected the available exceptions for conducting a search without a warrant, we accept the district court's analysis and proceed to the next step in our analysis.

■ Zornes argues that, under our standard from *State v. Hardy*, 577 N.W.2d 212, 215–16 (Minn.1998), a statement alone from investigating officers is sufficient to begin a search, if the statement is made for an investigatory purpose. We need not address Zornes's argument under *Hardy* because we conclude that the admission of Zornes's statement was harmless beyond a reasonable doubt. Further, we need not address when the search of Zornes began or the elements for determining when the potentially erroneous admission of evidence warrants a new trial under the Fourth Amendment. *See State v. Hall*, 764 N.W.2d 837, 845 (Minn.2009) (declining to reach the merits of a defendant's argument because even if error was present it was harmless). We have outlined five factors relevant to determining if an error was harmless beyond a reasonable doubt: (1) the manner in which the evidence was presented; (2) whether the evidence was highly persuasive; (3) whether the evidence was used in closing argument; (4) whether the evidence was effectively countered by the defendant, and (5) whether the other evidence of guilt was overwhelming. *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn.2005); *see also State v. Caulfield*, 722 N.W.2d 304, 314–15 (Minn.2006).

### 1. *Manner in Which the Evidence Was Presented*

Zornes's statement was mentioned four times at trial: once during defense counsel's opening statement; once during Nelson's testimony; and once during each side's closing arguments. Nelson's direct testimony spans 42 pages in the trial transcript; his total testimony covers 52 pages. Therefore, Zornes's statement was mentioned on one line out of approximately 1,300 lines of Nelson's testimony. The State's closing argument covers 124 pages, meaning Zornes's statement was mentioned on one line out of 3,100 lines in the State's closing argument. In *Caulfield*, we stated that, given the short nature of the bench trial in that case, there was "no chance" that the disputed evidence "was lost among a plethora of other evidence." 722 N.W.2d at 314. The present case is distinguishable from *Caulfield* given the extensive nature of the trial and proceedings, of Nelson's testimony, and of the State's closing argument. We conclude that the inclusion of Nelson's testimony about Zornes's statement was only a minimal factor in the overall context of his trial.

### 2. *Whether Evidence Was Highly Persuasive*

In *Caulfield*, the disputed evidence was a lab test result that was "highly persuasive evidence" demonstrating that a disputed substance was in fact cocaine. *Id.* In this case, the admitted statement is ambiguous. It is not clear from the record whether, at the time the statement was made, Zornes had been informed that he was being investigated for murder and arson. Further, Zornes had allegedly been hiding from police because of outstanding warrants from Becker County. In Zornes's statement—that "it" was not sexual in nature—the antecedent of "it" is ambiguous. The statement could have been in reference to the murders of Londo and Cadotte, or in reference to the Becker County warrants, or it could have related to some other event altogether. In addition, Jaeche did not hear Zornes's statement despite being the person who was conducting the search, a point highlighted

by the defense. Thus, we conclude that, at best, Zornes's statement was only somewhat persuasive evidence against him.

### 3. *Reference to Evidence in State's Closing Argument*

As mentioned above, the State made one reference to Zornes's statement in a 124–page, 3,100–line closing argument. As the State points out in its brief, the State made no effort to point out why the statement was significant or inculpatory. Thus, we conclude there was only minimal use of Zornes's statement by the State in its closing argument.

### 4. *Effective Counterweight to the State's Evidence by the Defendant*

In *Caulfield*, the defense did not rebut the lab report that was the disputed evidence in that case. *Id.* at 315. In *State v. Wright*, we balanced the "dramatic and highly persuasive nature" of disputed statements and the "manner in which they were presented and used by the [S]tate" with the "counterweight [the defendant] provided through cross-examination and closing argument" and held the counterweight was "insufficient." 726 N.W.2d 464, 478 (Minn.2007). Here, the defense pointed out that, despite having a tape recorder with him, Nelson did not have the recorder on, and that even though the room was very small, Jaeche did not hear the statement. Given the low profile of the State's presentation of Zornes's statement at trial and the mixed persuasiveness of the evidence in the first place, the defense's rebuttal provided an effective "counterweight" to balance the district court's allegedly erroneous admission and the State's use of Zornes's statement.

### 5. *Whether Evidence of Guilt Is Overwhelming*

There is no direct eyewitness testimony about Zornes having committed the murders and there is no forensic evidence connecting him to the murders or the scene of the crime. But there is significant evidence connecting Zornes to the victims, the murder scene, the arson, and the car theft. Zornes was seen entering the apartment with Londo and Cadotte and no other individuals were seen with the victims or in the apartment around the time of the murders. There was extensive telephone and text message contact between E.M.'s cellphone and Cadotte's cellphone on the night of the murders, despite the fact that the two did not know each other. There is testimony that Zornes was using Cadotte's cellphone, thus placing him with the victims. A neighbor who lived in the apartment building heard "two males and a female" in the apartment beneath him. The apartment door was locked and Londo, who was last seen alive with Zornes, had the only key. Zornes made repeated, inconsistent statements to acquaintances that placed him in the vicinity of the apartment at the time of the murders and arson. Zornes stole Cadotte's car and set fire to it in a remote area. An investigation of the apartment revealed a location where it appeared a smoke detector had been removed and a smoke detector was subsequently found in Cadotte's car. It is highly likely that Zornes removed the smoke detector from the apartment and placed it in Cadotte's car. Zornes was found at a remote, hidden campsite, where he had in his possession the types of implements most likely to have been used in the murders. The recovery of C.C.'s possessions from S.W.'s home, possessions that C.C. had stored in her apartment, also demonstrates Zornes was likely to have been at the scene of the murders and arson. When all of this evidence is combined, we conclude that overwhelming evidence of Zornes's guilt was presented at trial.

After weighing all of the forgoing five factors for assessing harmless error and then placing them in context with the minimal use of Zornes's statement at trial, the effective rebuttal of the statement by Zornes's trial counsel, the overall minimal persuasive weight of the statement, and the overwhelming evidence showing that Zornes caused the deaths of Cadotte and Londo, we conclude that the admission of Zornes's statement was harmless beyond a reasonable doubt. Therefore, we hold that the court's admission of Zornes's statement did not constitute reversible error.

### III.

The third issue raised by Zornes is whether the district court erred by admitting into evidence a folding knife, utility knife, scissors, screwdriver, and hammer found on or with him at his campsite at the time of his arrest. Zornes argues that these items were not relevant under Minn. R. Evid. 401 and thus were not admissible. The State claims the items were relevant because they were the type of objects that could have caused the deaths of Cadotte and Londo. The State has the better argument on this issue.

We have held that "[a] trial court's admission of physical evidence will be upheld unless it constitutes an abuse of discretion." *State v. Daniels,* 361 N.W.2d 819, 827 (Minn.1985) (citing *State v. Webber,* 292 N.W.2d 5, 9 (Minn.1980)); *see also State v. Stewart,* 514 N.W.2d 559, 564 (Minn.1994) (reviewing the admission of evidence under the abuse-of-discretion standard).

The Minnesota Rules of Evidence state that only "relevant" evidence is admissible. Minn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. We have held that "physical objects connected with a crime or which are the subject matter of an investigation are admissible," as are objects that connect the defendant to the crime scene. *State v. Olek,* 288 Minn. 235, 242, 179 N.W.2d 320, 325 (1970). We have defined what constitutes relevant physical evidence in two leading cases: *Olek,* 288 Minn. 235, 179 N.W.2d 320, and *State v. Kotka,* 277 Minn. 331, 341, 152 N.W.2d 445, 452 (1967). In *Olek,* we held that objects connected to the crime scene or the investigation can be admitted; the fact that the objects are not directly tied to a defendant only affects the weight of the evidence. 288 Minn. at 242, 179 N.W.2d at 325–26. If there is "no question" that the victim died from a wound consistent with a type of weapon possessed by the defendant, then the weapon is admissible. *Kotka,* 277 Minn. at 341, 152 N.W.2d at 452. We also have held that "[p]roof that the defendant possessed the type of weapon with which the crime was committed is sufficient to make that weapon admissible." *Daniels,* 361 N.W.2d at 827.

Zornes acknowledges that "physical objects connected with a crime scene are relevant and admissible," as are objects that connect the defendant to the crime scene. But Zornes cites our decision in *State v. Lubenow* to argue that evidence is not admissible merely because it "could have" caused a victim's injuries. 310 N.W.2d 52, 56 (Minn.1981). Zornes concludes by arguing that, given the lack of direct evidence linking him to the crime scene, the admission of the items described above was highly prejudicial to him. The State responds by distinguishing the present case from *Lubenow* by noting that *Lubenow* was a sufficiency-of-the-evidence decision and therefore did not alter our analysis in *Kotka* and *Olek.* The State fur-

ther argues that Zornes has not carried his burden of showing that the admission of the items prejudiced him by "substantially influencing the jury verdict."

In *Lubenow,* we articulated a somewhat stricter standard for admitting this type of evidence. 310 N.W.2d 52. The defendant in that case had been found with hunting arrows in his vehicle. *Id.* at 56. At trial, a doctor testified that the victim's injuries "could" have been made by the arrows,[3] but conceded that "any number of other instruments could also have made the injuries." *Id.* We stated in *Lubenow* that if there is only a mere possibility that evidence was connected to a crime, with no forensic or other connection, the evidence is not relevant. *Id.* We then held that the arrows in *Lubenow* were not relevant and should have been excluded. *Id.* We also excluded the victim's nonverbal deathbed responses, found that the evidence at trial was consistent with the defendant's innocence, found prejudicial errors by the district court and the State, and ultimately concluded that there was insufficient evidence to sustain the conviction. *Id.* at 56–58.

One year after deciding *Lubenow,* we affirmed the admission into evidence of a bullet because it was found on the defendant and "could have produced" the flashes that the victim had seen coming from a gun, and was thus sufficiently connected to the crime. *State v. Gayles,* 327 N.W.2d 1, 2 (Minn.1982). More recently, in *State v. Taylor,* we held that the fact that the victim's blood was on a die stamp, the purported murder weapon, *tended* to show that the die stamp was the murder weapon. 650 N.W.2d 190, 205 (Minn.2002). Further, we held that the die stamp being the murder weapon was consistent with

the medical examiner's testimony that the murder weapon was a heavy, man-made object, which was sufficient to connect the die stamp to the murder. *Id.* The holding in *Taylor* mirrors a pre-*Lubenow* holding in which we allowed a knife into evidence because the knife "felt like the object" that the victim had been forced to touch. *State v. Coy,* 294 Minn. 281, 287, 200 N.W.2d 40, 44 (1972).

Ruling from the bench in this case, the district court held that "in light of the unique claims of the parties and the unique facts of this case," the contested items would be admitted into evidence. The court stated that *Lubenow* did not need to be read literally based on the line of cases decided after it. The court found that the items would not be overly prejudicial because none of them were "originally designed and intended as a weapon," and that in this case the State should be able to present its evidence and allow the jury to weigh it because "[e]ven though the relevance is not high, it is there."

 As already stated, absent an abuse of discretion we will not overturn the district court's evidentiary rulings. In this case, the first factor in considering the relevancy of the physical evidence—the connection between the defendant, Zornes, and the disputed items—is not contested. Zornes was found with the disputed items either on or near his person, in a remote location that only he had access to. Thus, our analysis of this issue turns on the second factor, whether the items were sufficiently connected to the crime scene. The medical examiner who examined the victims' bodies used overlays of the shape of different instruments and the wounds on the victims and determined that a ham-

---

**3.** The injury in *Lubenow* was distinctive: the victim had been pierced by a "long, narrow, and very sharp" object that had entered through her vagina, run through several organs, and into her right lung. *Id.* at 53.

mer was the most likely blunt-force weapon used to kill Londo and Cadotte and that a single-sided knife was used on both victims.

Here, the connection between the items collected from Zornes and the crime is at least as strong as the flash that was witnessed in *Gayles,* in which we noted that the bullet allowed into evidence "could have" been the cause. 327 N.W.2d at 2. We have also previously held that, if a defendant possesses the same type of weapon that was used in a crime, then that weapon can be admitted into evidence. *Daniels,* 361 N.W.2d at 827. While a strict reading of *Lubenow* alone could lead to the conclusion that the disputed items should have been suppressed, as the district court and the State both articulate, *Lubenow* was a special case because it also involved serious doubts by our court about the overall sufficiency of the evidence. 310 N.W.2d at 57.

 Significant evidence in the case before us connects Zornes to the scene of the crime and to the victims. While the utility knife, scissors, and screwdriver were not explicitly tied to the crime scene or the murders, they were directly tied to Zornes and were the same type of weapon use in the crime. The utility knife, scissors, and screwdriver were also not mentioned by the State during the case and thus their admission was not sufficiently prejudicial to outweigh their probative value. The items were mentioned once by the defense, during opening argument. Therefore, we hold that the district court did not abuse its discretion when it admitted the disputed items.

## IV.

The fourth and final issue that Zornes raises is his assertion that the district court abused its discretion when it ruled that the State could impeach him with three prior felony convictions if he chose to testify at trial. More specifically, Zornes argues that the probative value of his prior felonies was outweighed by their prejudicial effect, and admission of the convictions prevented him from testifying at his own trial out of fear of being impeached with the convictions. Zornes's argument incorporates the factors we articulated in *State v. Jones,* and he asserts that, because he wished to assert an alibi defense, the importance of his testimony outweighed the other factors from *Jones.* *See* 271 N.W.2d 534, 538 (Minn.1978). The State counters by conducting its own review of the *Jones* factors and asserting that the appropriate weighing of those factors means that Zornes's prior felony convictions were admissible.

We have held that we will not reverse a district court's ruling on the impeachment of a defendant with his prior conviction absent an abuse of discretion. *State v. Williams,* 771 N.W.2d 514, 518–20 (Minn. 2009). Our rules of evidence set forth two requirements for the admission of prior convictions as impeachment evidence. Minn. R. Evid. 609(a). First, the prior conviction will be admitted only if

> the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment.

*Id.* Second, "[e]vidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction." Minn. R. Evid. 609(b). We apply this same standard to defendants who wish to testify in their own

defense. *See Williams*, 771 N.W.2d at 517–18.

■ As the parties discuss, in *Jones*, we laid out five factors relevant to determining if a prior conviction is more probative than prejudicial: (1) the impeachment value of the prior crime; (2) the date of conviction and the defendant's subsequent history; (3) the similarity of the past crime with the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. 271 N.W.2d at 537–38; *see also Williams*, 771 N.W.2d at 518–20 (applying *Jones* factors).

■ In the present case, the State sought to impeach Zornes with three prior felony convictions and Zornes moved to have them excluded. The district court denied Zornes's motion and ruled that, if Zornes were to testify, the State could impeach him with the felony convictions. Zornes subsequently elected not to testify. Zornes's three prior felony convictions were:

- A January 7, 1997 conviction of felony introducing contraband into a state prison. Zornes committed the offense on December 7, 1995, but because Zornes was already incarcerated his sentence was presumptively consecutive and he did not finish serving the sentence for this conviction until June 11, 2000.
- A June 29, 2001 conviction for felony possession of stolen explosives, for which Zornes received a sentence of 77 months.
- An April 29, 2008 conviction of felony driving under the influence of alcohol.

All three of Zornes's prior convictions fall within the admissibility standard under Rule 609(a). Moreover, because of the consecutive nature of Zornes's sentence for the 1997 conviction, 10 years had not elapsed between his release from confinement for that conviction and the perpetration of the crimes he was charged with in this case. Therefore, the *Jones* balancing test factors apply to all three convictions.

■ *Impeachment value of the prior crimes.* We have held that "*any* felony conviction is probative of a witness's credibility" because it allows the fact-finder to see the whole person and his "general lack of respect for the law." *State v. Hill,* 801 N.W.2d 646, 651–52 (Minn.2011). But crimes that have some bearing on dishonesty have more impeachment value than other crimes. *See State v. Bettin,* 295 N.W.2d 542, 546 (Minn.1980). While Zornes's prior felonies were not crimes of dishonesty, they were still felonies and thus this factor weighs in favor of their admission.

*The date of conviction and defendant's subsequent history.* We have recognized that a history of lawfulness since a conviction can limit a conviction's probative value; but, if a witness is convicted again or sent back to prison, then the witness's "history of lawlessness" enhances an otherwise "stale" conviction's probative value. *See State v. Ihnot,* 575 N.W.2d 581, 586 (Minn.1998). Zornes spent most of his time following his first felony conviction in prison. While Zornes's oldest felony conviction occurred 9 years and 8 months before the date of the offenses he was charged with in this case, he spent most of that time in prison. This factor weighs strongly in favor of the probative value of the convictions and thus in favor of their admission.

*The similarity of past crime with the charged crime.* We have held that if a prior conviction is similar to the crime a defendant is charged with, then the prejudicial effect of admitting the prior conviction increases. *Bettin,* 295 N.W.2d at 546. There is little similarity between Zornes's past crimes and the crimes he was charged

with in this case. Therefore, the prejudicial concern lessens compared to the probative value and this factor weighs in favor of the admission of the prior convictions.

 *Importance of defendant's testimony.* A defendant has a constitutional right to present his version of events to a jury. *State v. Richardson,* 670 N.W.2d 267, 288 (Minn.2003). And we have held that a district court may exclude a defendant's prior convictions if their admission for impeachment purposes might cause the defendant not to testify *and* it is more important in the case to have the jury hear the defendant's version of the case than to allow him to be impeached. *Bettin,* 295 N.W.2d at 546. Zornes claims that his testimony would have been highly important in establishing his alibi defense. Zornes alleged that he was with E.M. on the morning of the murders. But, E.M. testified that she was not with Zornes that morning. Therefore, we conclude that Zornes's E.M.-alibi testimony would have had, at best, mixed persuasive value.

*Centrality of the credibility issue.* We have held that when a defendant's credibility is a central issue, "a greater case can be made for admitting the impeachment evidence [of the prior convictions], because the need for the evidence is greater." *Id.* The district court stated that Zornes's credibility "will be central to the case." There are no eyewitnesses to the crime in this case and no direct physical evidence. Therefore, the credibility of the various witnesses was central and this factor weighs strongly in favor of admitting the prior convictions.

After applying and weighing the *Jones* factors in this case, we hold that the district court did not abuse its discretion when it ruled that the State could impeach Zornes with three prior felony convictions if Zornes chose to testify at trial.

Affirmed.