*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-1778**

State of Minnesota,
Respondent,

vs.

Bryant Terrell Garth, II,
Appellant.

**Filed November 3, 2025**
**Affirmed**
**Schmidt, Judge**
**Dissenting, Harris, Judge**

Stearns County District Court
File No. 73-CR-22-5514

Keith Ellison, Attorney General, Peter Magnuson, Thomas Ragatz, Assistant Attorneys General, St. Paul, Minnesota; and

Janelle Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Anders J. Erickson, Johnson Erickson Criminal Defense, Minneapolis, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Schmidt, Judge; and Harris, Judge.

**NONPRECEDENTIAL OPINION**

**SCHMIDT**, Judge

Appellant Bryant Terrell Garth, II challenges the sufficiency of the evidence for his convictions of four counts of aiding and abetting attempted first-degree premeditated

murder. He also argues that the district court abused its discretion by denying his motion for a mistrial for a violation of a sequestration order and by imposing four consecutive sentences totaling 888 months. Because the evidence was sufficient to sustain his conviction and because we discern no abuse of discretion, we affirm.

**FACTS**

On July 6, 2022, two groups of men and juvenile males gathered in St. Cloud in anticipation of a fistfight. One group, which included the four victims, gathered in a park. The second group, which included Garth, as well as Daquan Ledbetter and T.S., gathered in a nearby apartment complex parking lot.

A surveillance video at the apartment complex captured the events that occurred in the apartment parking lot. Jamarcus Morris pulled into the parking lot in a white Nissan and backed into a parking space. Morris exited the driver's door wearing a black sweatshirt, black pants, and a white mask. Garth—wearing a white t-shirt, blue jeans, and black shoes—walked to the front passenger door of Morris' car. Ledbetter and T.S. followed behind Garth. Morris walked to the group that included Garth.

After a brief conversation, Morris went back to the car and Garth, Ledbetter, and T.S. followed. Morris opened the front door and Garth tried to open the passenger's side door, but it was locked. The group that had gathered in the park began taunting Garth's group while Ledbetter and T.S. turned to look at Garth. Garth reached into his pocket, pulled out a gun, and held it behind his leg. Garth walked quickly towards the other group with the gun by his side. Morris exited the car, left the driver's side door open, pulled out a gun, and also walked quickly towards the other group.

2

As Garth and Morris approached, some in the other group began to run away. Morris then began running toward the group. Either Garth or Morris began shooting at the other group, causing more people to flee. Morris stopped advancing, planted his legs, and—shifting his aim several times—continued shooting towards the people running away. Garth also continued to shoot toward the group. Ledbetter—who had temporarily ducked behind a car—stood up and began firing a gun. Garth, Morris, and Ledbetter fired a total of 28 shots. After the shooting stopped, Garth, Morris, Ledbetter, and T.S. ran to Morris's car, got into the vehicle, and fled the scene.

The gunshots struck and injured four people. A bullet struck one victim in the back and traveled through his lung. A doctor testified that the bullet was "within probably a centimeter at the most" of hitting a major artery. Another bullet struck the second victim in the elbow, fracturing a bone and requiring two plates and 16 screws to be placed into that victim's arm. Another bullet struck the third victim in the back of the head. Finally, a bullet struck the fourth victim in the head, causing "a depressed skull fracture pushing bone into his brain and then the bullet exited his scalp." All four victims survived, but a medical professional characterized them as "lucky" they did not sustain fatal injuries.

Police recovered "numerous amounts of [bullet] casings" in the alley and parking lot. Police identified "at least three different firearms" involved in the shooting but could not identify which shooter's bullets hit which victim.

Respondent State of Minnesota charged Garth with four counts of aiding and abetting attempted first-degree premeditated murder, four counts of aiding and abetting second-degree assault, and one count of ineligible possession of a firearm.

3

Before trial, the district court ordered "all potential trial witnesses be sequestered or excluded from the courtroom prior to" testifying. On the second day of trial, an attorney observed several police-officer witnesses in a stairwell of the courthouse talking.

At a hearing to address the alleged violation of the sequestration order, the attorney testified that one officer said, "something along the lines of, she's going to ask you questions like," but the officers "became quiet" and "broke up" after she approached the top of the stairs. Video surveillance of the doors to the stairwell showed four officers in the stairwell for approximately 38 seconds. All four officers testified that the stairwell conversation concerned "the style of question[ing]." A sergeant—who was neither a witness at trial, nor subject to the sequestration order—instructed the other officers to wait for a question before responding.

The officers also testified about their knowledge of the sequestration order. The sergeant testified that he understood what a sequestration order was and that he knew the other three officers had a sequestration between themselves. One officer testified that he did not know what "sequestration" meant, but he knew he was not allowed to discuss testimony. Another officer testified that he was unfamiliar with the term "sequestration," but he knew he was not supposed to talk about the case.

One of the officers who was part of the stairwell conversation had already testified at trial before the violation occurred. A second officer, who had processed the crime scene, testified at trial after the stairwell conversation but before it was reported to the court. A third officer had not yet testified at trial. The sergeant was not a witness at trial, but observed the first officer's testimony before the violation occurred.

4

After the hearing about the alleged sequestration order violation, Garth moved for a mistrial. The district court denied the motion. The district court found that the officers had violated the sequestration order but determined that the 38-second conversation did not prejudice Garth because there was no indication that officers were told "what they should testify to." The district court prohibited the fourth officer—who had not yet testified—from testifying in order "to remove any possibility of the appearance of prejudice relating to his testimony."

The jury found Garth guilty on all counts. The district court convicted Garth of one count of ineligible person in possession of a firearm and four counts of aiding and abetting attempted first-degree premeditated murder.[1] The district court sentenced Garth on the four aiding and abetting attempted first-degree murder convictions, imposing four consecutive sentences totaling 888 months.

Garth appeals.

---

[1] The district court accepted the jury's guilty verdicts on the four counts of aiding and abetting second-degree assault with a dangerous weapon. The district court appropriately did not enter convictions on those counts because they were part of the same behavioral incidents underlying the aiding and abetting attempted first-degree murder.

**DECISION**

## I. The circumstantial evidence was sufficient to sustain Garth's conviction of aiding or abetting attempted first-degree murder.

Garth does not contest that the state's circumstantial evidence proved that he either committed, or aided and abetted his accomplices in committing, the second-degree assault offenses. But he does argue that the state failed to prove that he aided and abetted his accomplices in committing attempted first-degree premeditated murder. Garth contends that he only intended to "frighten the victims," not kill them.

The jury convicted Garth of aiding and abetting attempted first-degree premeditated murder. Attempted first-degree premeditated murder required the state to prove that Garth, did an act that was "a substantial step toward, and more than preparation for" "caus[ing] the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. §§ 609.17, subd. 1, .185(a)(1) (2022).

To prove that a person aided and abetted a crime, the state must prove that the person "intentionally aid[ed], advise[d], hire[d], counsel[ed], or conspire[d] with or otherwise procure[d] the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2022). The state must additionally prove that Garth (1) "knew that his alleged accomplices were going to commit a crime" and (2) "intended his presence or actions to further the commission of that crime." *State v. McAllister*, 862 N.W.2d 49, 52 (Minn. 2015) (quotation omitted). Due process requires that every element of a crime be proved beyond a reasonable doubt in order to convict an individual of a charged crime. *In re Winship*, 397 U.S. 358, 364 (1970); *State v. Christie*, 506 N.W.2d 293, 297 (Minn. 1993).

6

When reviewing the sufficiency of the evidence, we must "determine whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Smith*, 9 N.W.3d 543, 564–65 (Minn. 2024). In doing so, we view the evidence in the light most favorable to the verdict. *Id.* at 565.

Premeditation and intent are states of mind and are proven through circumstantial evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 474 (Minn. 2010). Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotations omitted). Both parties agree that Garth's convictions were based on circumstantial evidence.

Under the circumstantial evidence standard of review, we first "identify the circumstances proved by winnowing down the evidence presented at trial to a subset of facts that is consistent with the jury's verdict and disregard evidence that is inconsistent with the jury's verdict." *Smith*, 9 N.W.3d at 565 (quotation omitted). Second, we consider whether the reasonable inferences "drawn from the circumstances proved . . . are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* We view the record as a whole, not isolated facts. *Id.*

## A. Circumstances Proved

We first identify the circumstances proved as viewed in the light most favorable to the verdict. *Id.* at 564-65. Those circumstances are:

- Two groups of people gathered in anticipation of a fistfight;

- One group, consisting of Garth, Morris, Ledbetter, and T.S. surrounded Morris' white Nissan behind an apartment complex in a parking lot;

- Garth, Morris, Ledbetter, and T.S. moved towards the white Nissan;

- The other group began taunting Garth's group;

- Garth took out his firearm and approached the second group holding the gun next to his leg;

- Morris followed Garth, pulled out his gun, and moved toward the group;

- Someone in the second group saw a gun, and everyone in that group began running away from Garth and Morris;

- Morris then ran towards the second group and began firing;

- Morris planted his feet, moved his gun as he aimed, and fired at the group;

- Garth also started shooting his gun at the people who were running away;

- Ledbetter also pulled out his gun and began firing at the second group;

- Garth, Morris, and Ledbetter fired their guns for at least seven seconds;

- The three collectively fired 28 shots before Garth, Morris, Ledbetter, and T.S. fled in Morris's car;

- Four victims were struck by the gunfire: one bullet struck a victim in the elbow, another bullet struck a second victim in the back, another bullet struck a third victim in the back of the head, and another bullet struck the fourth victim in the head.

8

**B.      Reasonable Inferences Drawn from the Circumstances Proved**

We next consider whether the reasonable inferences drawn from the circumstances proved are consistent with the guilty verdict and "inconsistent with any rational hypothesis other than guilt." *Id.* at 565.

Based on the circumstances proved, a jury could reasonably find that Garth knew that one of his accomplices was going to commit a crime. Garth was in the parking lot and had a close association with Morris before the shooting, after the shooting, and when his group fled the scene. Such close association can infer accomplice liability. *See State v. Segura*, 2 N.W.3d 142, 156 (Minn. 2024) ("accomplice liability can be inferred from . . . presence at the scene of the crime, a close association with the principal before and after the crime . . . and [his] flight from the scene of the crime with the principal") (quotation omitted). Garth also did not act surprised or otherwise object when Morris began firing. *Id.* ("accomplice liability can be inferred from . . . a lack of objection or surprise under the circumstances") (quotation omitted). Instead, Garth joined in firing at the people fleeing. And Garth was the first person to pull out his gun, which escalated the conflict between the groups. These facts support a hypothesis that Garth is guilty.

Garth contends there is a rational hypothesis other than guilt, namely that he did not know that Morris was going to commit a premeditated murder. Garth cites the following circumstances that he argues support the inference that he only intended to commit an assault-fear crime: the shooting took place in broad daylight, Garth did not conceal his identity, and after he stopped shooting, Garth ran back to Morris' car instead of pursuing the other group. Garth's argument is unavailing.

9

The circumstances that Garth cites are not consistent with the verdict, and they do not lead to a reasonable hypothesis other than guilt. The circumstances proved established that Garth escalated the dispute by pulling out a gun and he then joined Morris in firing.

We are also not persuaded by Garth's characterization of returning to Morris's car rather than pursuing the second group. The circumstances proved—in the light most favorable to the verdict—establish that Garth fled the scene with Morris, which further supports an inference of accomplice liability. *Id.* (fleeing with the principal from the scene of the crime supports an inference of accomplice liability). Garth's alternative characterization of the events does not present a hypothesis other than guilt.

We rejected a similar argument from Garth's accomplice in *State v. Ledbetter*. *See* No. A23-1593, 2024 WL 5244880 (Minn. App. Dec. 30, 2024), *rev. denied* (Minn. Mar. 26, 2025). Ledbetter also argued that the evidence was insufficient to prove that any of his accomplices acted with premeditation to commit murder. *Id.* at *3. In rejecting Ledbetter's argument, we noted that Ledbetter and his accomplices arrived armed with guns to what was supposed to be a fistfight. *Id.* at *5. We concluded that:

> the only reasonable inference from the circumstances proved is that the shooting was a premeditated attack and that Ledbetter knew of the planned attack, even if just for a few moments before it occurred. Especially in light of those facts, Ledbetter's intent to aid the commission of the crime is easily established by his actions of following his accomplices toward the other group, drawing his gun, and shooting at the other group. The circumstances proved do not reasonably suggest the three shooters were acting independently or that Ledbetter did not intend his presence and actions to aid in the commission of the crime.

10

*Id.* at \*7. The state persuasively notes that we reached this conclusion despite Ledbetter being the last of Garth's group to approach the other group.

Unlike Ledbetter, Garth was the first to draw his gun and he was the first to approach the second group. After Morris began firing, Garth joined in and fired six times. As in *Ledbetter*, the only reasonable inference from the circumstances proved is that the shooting was a premeditated attack, Garth knew of the plan, and he actively participated. The circumstances proved are consistent with Garth's guilt as an accomplice to attempted first-degree murder and inconsistent with any rational hypothesis other than guilt.

**II.     The district court did not abuse its discretion in denying the mistrial motion.**

Garth argues that the district court abused its discretion in denying his motion for a mistrial after several officers violated the sequestration order. We review the "denial of a motion for a mistrial for abuse of discretion." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006). A court abuses its discretion "when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Foster*, 20 N.W.3d 6, 20 (Minn. 2025) (quotation omitted). A "mistrial should be granted only if there is a reasonable probability" that the outcome would have been different had the incident prompting the motion not occurred. *State v. Griffin*, 887 N.W.2d 257, 262 (Minn. 2016).

In analyzing the district court's ruling regarding the sequestration order violation, we must first determine whether there was a violation of the sequestration order. *State v. Erdman*, 383 N.W.2d 331, 334 (Minn. App. 1986), *rev. denied* (Minn. Apr. 24, 1986). If so, we next analyze whether the district court abused its discretion in assessing prejudice resulting from the violation. *Id.*

11

**A.    The officers violated the sequestration order.**

The district court issued an order that sequestered witnesses from the courtroom before their appearance and prohibited witnesses from discussing the case with other witnesses. The district court found that the officers violated the sequestration order during their stairwell conversation. The state does not dispute the district court's finding that a violation occurred. We agree that the officers violated the sequestration order.

**B.    The violation did not affect Garth's substantial rights.**

We next analyze the district court's assessment of prejudice. *Id.* For a violation of a sequestration order, prejudice is demonstrated when the violation either "influence[d] the testimony of other witnesses" or there was "an attempt to influence the testimony of other witnesses." *Id.* "The trial judge is in the best position to determine whether an error is sufficiently prejudicial to require a mistrial or whether another remedy is appropriate." *Griffin*, 887 N.W.2d at 262.

Garth argues that the sergeant attempted to influence witness testimony by "relay[ing] information" about how questions were asked of witnesses and then "advis[ing] the officers on how to testify." We disagree for four reasons.

First, the district court properly found that Garth had not established that the sergeant attempted to influence the substance of any witness's testimony. The district court found that there was no indication that officers were told "what they should testify to" and that the "officers all testified credibly that the content of past and future testimony was not discussed." The district court determined that the 38-second conversation was not "intended to influence, or did influence, testimony" of the witnesses who had not testified.

12

We conclude that the district court properly based its ruling on whether the sergeant influenced, or attempted to influence, the substance of a witness' testimony. Focusing on the substance of a witness' testimony is consistent with precedent analyzing rulings on alleged violations of sequestration orders. For example, in *State v. Miller* we noted that the purpose of a sequestration order "is to remove any possibility that a witness . . . may be influenced consciously or subconsciously *by the testimony of other witnesses*[.]" 396 N.W.2d 903, 906 (Minn. App. 1986) (emphasis added). Similarly, the Minnesota Supreme Court has recognized that sequestering witnesses affords "opposing counsel the opportunity of bringing out in cross-examination *any discrepancies in the testimony of the various witnesses.*" *State v. Ellis*, 136 N.W.2d 384, 396 (Minn. 1965) (emphasis added). *See also State v. Zornes*, 831 N.W.2d 609, 618 (Minn. 2013) (noting that the "'exclusion of witnesses from [the] courtroom [is] a time-honored practice *designed to prevent the shaping of testimony by hearing what other witnesses say*'") (emphasis added) (quoting *Perry v. Leeke*, 488 U.S. 272, 281 n.4 (1989)).

Here, the district court found that the officers credibly testified that the content of the testimony was not discussed. *See State v. Ware*, 856 N.W.2d 719, 728 (Minn. App. 2014) ("We defer to the district court's credibility determinations."). Instead, the district court found that the conversation focused on defense counsel's speech pattern. The sergeant testified that he told the other officers that defense counsel makes long statements during cross-examination, and reminded the officers to wait to talk until defense counsel asked a question. The district court characterized the conversation as the sergeant talking "to the officers about a training topic—specifically, making sure to reply to questions and

to try not to respond to statements if possible—wait for it to be in the format of a question." Although this is a clear violation of the sequestration order, the district court did not abuse its discretion in finding that the statements did not influence the substance of any testimony.

Second, the district court thoroughly investigated the serious allegation before determining that Garth suffered no actual prejudice. After the court learned of the violation, it paused the trial and heard testimony from the attorney who reported the violation and from the officers involved. After nearly a full day of testimony to investigate the violation, the district court determined that Garth had not suffered any actual prejudice. The district court's prompt handling of the sequestration violation illustrates the best-practice approach for addressing such violations of its own order. The district court, here, appropriately paused the trial to investigate, took testimony at an evidentiary hearing outside the presence of the jury to investigate the allegations of the violation, made detailed findings of fact and credibility determinations, and ordered certain curative measures to limit the prejudice resulting from the violation.

The district court found that one officer had testified after the violation occurred, but before the district court learned of the violation. That officer, however, testified about a different topic (scene processing) than the officer who testified immediately prior to the conversation (identification). Thus, the district court appropriately found that the substance of the second officer's testimony was not influenced by the first officer's testimony.[2]

---

[2] The district court's ruling is consistent with a nonprecedential decision from our court, which we cite for its persuasive value. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c). In *State v. Flowers*, we affirmed the district court's denial of a mistrial motion when police

14

In addition, the district court noted that the officer who testified after the violation occurred—but before the court learned of the violation—had already testified about the same topics in the two prior trials for Morris and Ledbetter. The district court found that the officer credibly testified that his testimony was not different in Garth's case as compared to Morris' and Ledbetter's cases. We defer to the district court's credibility determination. *Ware*, 856 N.W.2d at 728.

In similar circumstances, the supreme court has upheld a district court's denial of a motion for a mistrial on the prejudice prong when a witness had previously testified. *Ellis*, 136 N.W.2d at 396. The supreme court agreed that the defendant suffered no prejudice when the district court finds, like it did here, that there is "no substantial variation from or inconsistency [between] their previous testimony" and their current testimony. *Id.*

Third, despite finding no actual prejudice, the district court carefully crafted precautionary measures to fashion a remedy for any perceived prejudice. The district court recognized that one officer involved in the stairwell conversation had not yet testified. The district court prohibited this witness from testifying in order "to remove any possibility of the appearance of prejudice relating to his testimony." The district court also crafted another curative measure—allowing defense counsel to recall the two witnesses who had

officers violated a sequestration order by discussing the case "for several hours before being called to testify." 2009 WL 1684285, at *2 (Minn. App. June 16, 2009). Despite the clear violation of the sequestration order, we affirmed the district court's denial of the motion for a mistrial because "[n]one of the officers observed the actual testimony of the other officers, and each was called to testify regarding different aspects of the case." *Id.* at *3. Similarly, the officers here did not actually observe any other witness's testimony and each officer testified about different topics.

already testified to use the sequestration violation as impeachment. *See State v. Martin*, 773 N.W.2d 89, 110 (Minn. 2009) (concluding appellant failed to establish prejudice from sequestration violation, in part, because defense had opportunity to question witness about sequestration violation). Defense counsel declined to do so in this case. The district court appropriately—and commendably—exercised its discretion by fashioning a remedy for any perceived prejudice.

Fourth, Garth has not established a "reasonable probability" that the trial's outcome would have been different had the incident prompting the mistrial motion not occurred. *Griffin*, 887 N.W.2d at 262. The order before us on appeal is the district court's denial of Garth's motion for a mistrial. Under that standard of review, Garth needed to show prejudice beyond that of a violation of the sequestration order (i.e., an attempt to influence a witness's testimony). *See id.* Instead, Garth had to show there is a "reasonable probability" that the trial's outcome would have been different had the sergeant not had a 38-second conversation with three officers who were witnesses in the trial. *Id.* For the reasons previously articulated, Garth has not made that showing on appeal.

We conclude that the district court's findings of fact are not against logic and facts in the record, and its conclusions of law do not reflect a misapplication of the law. *See Foster*, 20 N.W.3d at 20. Accordingly, the district court did not abuse its discretion by denying Garth's motion for a mistrial.

Our affirmance today should not be read to endorse the violation of the sequestration order. The state appropriately did not challenge the violation prong on appeal. The violation should never have happened. And the prosecutors should have provided better

16

instructions to the state's witnesses about the sequestration order that the district court issued. But the record, here, demonstrates that the district court—being in the best position to assess prejudice—determined that any possible prejudice did not require a mistrial. *Griffin*, 887 N.W.2d at 262. Although another district court may have exercised its discretion differently—by imposing additional cautionary measures or even granting a mistrial—the district court here acted within its discretion in carefully addressing the violation and imposing precautionary measures to address any perceived prejudice. *See Arundel v. Arundel*, 281 N.W.2d 663, 667 (Minn. 1979) ("we are not free to substitute our judgment for that of the trial court absent a clear abuse of its discretion.").

III. **The district court did not abuse its discretion by imposing four consecutive sentences.**

Garth lastly argues that the district court abused its discretion when it imposed four consecutive sentences totaling 888 months. Garth contends that the sentence unfairly exaggerates his culpability.

"We review a district court's decision to impose consecutive sentences for an abuse of discretion." *State v. McInnis*, 962 N.W. 2d 874, 892 (Minn. 2021). We will not disturb the imposition of permissive consecutive sentences "unless the resulting sentence unfairly exaggerates the criminality of the defendant's conduct." *Id.* (quotation omitted). In determining whether a district court abused its discretion, "we look to past sentences received by other offenders." *Id.* (quotation omitted). In so doing, we use "our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *State v. Norton*, 328 N.W.2d 142, 146–47 (Minn. 1982).

17

Garth contends that his sentence is disproportionate as compared to Morris (864 months) and Ledbetter (760 months). But "a defendant is not entitled to a reduction in his sentence merely because [his] co-defendant[s] received a lesser sentence." *State v. Olson*, 765 N.W.2d 662, 665 (Minn. App. 2009). Here, Morris received four consecutive sentences with an aggregate duration of 864 months based on a criminal-history score of zero. Garth received four consecutive sentences, but had a criminal-history score of four, which accounts for a higher duration of his presumptive sentences. Garth's criminal-history score thus accounts for the difference between his sentence and Morris' sentence.

The district court also did not abuse its discretion by imposing a higher sentence for Garth compared to Ledbetter. Within its discretion, the district court found that the facts demonstrate that Garth's culpability was closer to Morris's compared to Ledbetter. Unlike Ledbetter, Garth was the first person to pull out a gun and either fired first or immediately joined Morris in firing at the group of people running away.

Garth also contends there are no cases in which a defendant received four consecutive sentences totaling 888 months when there was no loss of life. But there are also no cases in which three people fired 28 shots at a group of other people who were running away before any shooting started. In addition, the district court found that Garth was a danger to public safety based on his prior violent convictions and that he committed the offenses "as part of a group of three or more persons who all actively participated in the crime." The district court, therefore, could have imposed an aggravated sentence as the state requested. The district court did not abuse its discretion in sentencing Garth.

**Affirmed.**

18

**HARRIS**, Judge (dissenting)

Although the abuse of discretion standard of review normally requires deference to the district court's decision, on these unusual facts, I must disagree with the majority's conclusion that the violation of the sequestration order did not affect Garth's substantial rights. Respectfully, I dissent.[1] Multiple law-enforcement officers having a secret meeting in a stairwell of a courthouse during a break in a trial for the purpose of instructing testifying officers on how to answer questions, I believe, was a clear attempt to influence the officers' testimony. This attempt to influence the testimony of other witnesses prejudiced Garth. *See State v. Erdman*, 383 N.W.2d 331, 334 (Minn. App. 1986), *rev. denied* (Minn. Apr. 24, 1986) (holding prejudice is demonstrated when the violation either "influence[d] the testimony of other witnesses" or was "an attempt to influence the testimony of other witnesses"). As a result, I would conclude that the district court abused its discretion in denying Garth's motion for a mistrial, and I would reverse and remand for a new trial.

The relevant facts of this case are straightforward. The district court issued a sequestration order at the outset of this criminal trial, the text of which ordered that "all potential trial witnesses be sequestered or excluded from the courtroom" prior to testifying. On the third day of trial, a sequestration violation was discovered when an attorney, who was at the courthouse for an unrelated matter, was walking up the stairs and "hear[d] a number of voices at the top of the stairs" and saw Sergeant L., and Officers G., N., and M.

---

[1] At the outset, I commend the district court judge for swiftly and thoroughly addressing the sequestration-violation issues in this matter.

"standing there talking." While the attorney did not hear the entire conversation, the attorney heard someone say, "she's going to ask you questions like" and heard additional discussion that appeared to relate to the trial. As the attorney approached the top of the stairs, the officers "became quiet," "broke up," and left in different directions. According to video surveillance, the officers were in the stairwell for approximately 38 seconds. The surveillance video shows Sergeant L., a supervisor, calling the other officers into the stairwell. Sergeant L. was not a witness in the trial but was there to observe officers testifying.[2] Sergeant L. testified that he understood what a sequestration order was, and that Officers G., N., and M. were subject to one. Officer G. testified prior to the violation and Officer N. testified after the violation. The district court excluded Officer M. from testifying because of the violation.

Garth moved for a mistrial arguing that there was "an attempt to influence the upcoming testimony" due to Sergeant L.'s seniority over the officers and that the stairwell conversation harmed Garth and his right to a fair trial with sequestered witnesses. The state conceded that there was a sequestration violation but argued that there was no prejudice requiring a mistrial.

The district court found that "the officers willfully disobeyed [the] sequestration order," but denied the motion for a new trial, concluding that Sergeant L. was "merely reminding the officers of a training topic." The district court found that the sequestration violation was not prejudicial because: (1) Sergeant L., an officer not under sequestration,

[2] At trial, the state acknowledged that although Sergeant L. was not technically under the sequestration order, "he should [have] know[n] better, and clearly [it was] improper."

was leading the conversation; (2) there was no indication that previous testimony was discussed or officers were told "what they should testify to"; (3) Officers G. and N. testified "on completely different topics"; (4) Officers G. and N. testified in two of Garth's co-defendant's trials and there was "no indication their testimony differed"; and (5) the district court prohibited Officer M. from testifying "to remove any possibility of the appearance of prejudice relating to his testimony." The district court also allowed the defense counsel to call Sergeant L. and Officers G. and N. to testify before the jury regarding the sequestration violation.

Garth argues that his convictions should be reversed because the district court abused its discretion when it denied his motion for a mistrial after several police officers violated the district court's sequestration order. This court reviews the denial of a motion for a mistrial for an abuse of discretion. *State v. Bahtuoh*, 840 N.W.2d 804, 819 (Minn. 2013). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Jaros*, 932 N.W.2d 466, 472 (Minn. 2019). "A mistrial should not be granted unless there is a reasonable probability that the outcome of the trial would be different if the event that prompted the motion had not occurred." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006) (quotation omitted). The district court is in the best position to determine whether an error from violation of a sequestration order is prejudicial enough that a mistrial is necessary. *State v. Griffin*, 887 N.W.2d 257, 262 (Minn. 2016).

It is undisputed that the officers violated the sequestration order by speaking to each other in the stairwell. *Erdman*, 383 N.W.2d at 334 (requiring an "indication in the record

D-3

that statements [were] made in violation of a sequestration order"). Indeed, the state affirmatively acknowledged it as such.

Once the district court finds the sequestration order was violated, it must determine whether the defendant was prejudiced. *Id.*; *State v. Bergland*, 202 N.W.2d 223, 224 (Minn. 1972). Prejudice is demonstrated when the violation either "influence[d] the testimony of other witnesses" or there was "an attempt to influence the testimony of other witnesses." *Erdman*, 383 N.W.2d at 334. When witness testimony is influenced, it may be based upon the words or actions of another. *See id.* (finding statements were not an attempt to influence testimony nor did they influence testimony because there was no indication on the record that testimony was based on threats). A witness may also be influenced if he "tailor[s] his[] testimony" in response to learning new information. *State v. Zornes*, 831 N.W.2d 609, 620 (Minn. 2013). In other words, a witness's testimony can be influenced by learning information from the proceedings. *Id*. The same statements can be made in an attempt to influence witness testimony or to actually influence witness testimony. *State v. Johnson*, 324 N.W.2d 199, 201 (Minn. 1982).

I agree with the majority that the district court thoroughly investigated the serious allegation. However, I would conclude that the district court abused its discretion because it did not base its ruling on whether the sergeant influenced or attempted to influence the witness's testimony, which is against logic and the facts in the record. The majority argues that the influence or attempted influence must affect the "substance of a witness's testimony." I disagree.

D-4

The Minnesota Supreme Court articulated that the public policy for sequestering witnesses is to prevent witnesses from tailoring their testimony in response to hearing the testimony of other witnesses. *Zornes*, 831 N.W.2d at 619. In *Zornes*, a witness was sequestered from voir dire to preserve the integrity of the trial process and to prevent a witness from "tailor[ing] . . . testimony in response to what is overheard during voir dire." *Id.* at 620. The supreme court noted that the purpose of sequestration is not only thwarted if a witness tailors his testimony based on knowledge of previous testimony, but also if he learns wider ranging information "cover[ing] details of trial strategy." *Id.* (noting sequestration prevents tailored testimony based off information learned in the courtroom, which is not limited to the contents of witness testimony). The supreme court echoed the logic of the U.S. Supreme Court that sequestration has the overall goal of "remov[ing] any possibility that a witness waiting to testify may be influenced." *Zornes*, 831 N.W.2d at 619 (quoting *State v. Ellis*, 136 N.W.2d 384, 396 (1965)).

The majority improperly narrows the definition of "attempting to influence" to whether information was shared about specific information from other witness's testimony. In other words, tailoring testimony to *match* other testimony or otherwise changing the substance of testimony is the only way in which testimony may be influenced. But tailoring testimony includes not only changing the substance but also how the testimony is delivered. *See Zornes*, 831 N.W.2d at 620. Additionally, this court has held that prejudice is demonstrated when the violation either "influence[d] the testimony of other witnesses" or

there was "an attempt to influence the testimony of other witnesses." *Erdman*, 383 N.W.2d at 334.[3]

Garth argues that an attempt to influence occurred because Sergeant L. intentionally instructed multiple officers to meet with him behind closed doors to discuss how the witnesses should respond to defense counsel's questions. I agree. Here, Sergeant L. testified that he "wave[d] [the officers] in to come speak with [him]" despite knowing there was a sequestration order because he "wanted it to be a private conversation." The officers testified that Sergeant L. spoke about testimony that occurred in the courtroom and instructed them on how to answer questions based on the "style of question[ing]." By instructing and advising the officers how to respond based off what had already happened during the trial, Sergeant L. attempted to influence how the testimony was delivered. As such, the sequestration-order violation was an attempt to influence witness testimony.

The majority, in a footnote, notes that the district court's ruling is consistent with our nonprecedential decision in *State v. Flowers*, No. A08-0475, 2009 WL 1684285, at *2 (Minn. App. June 16, 2009), where we affirmed the district court's denial of a mistrial motion when police officers violated a sequestration order by discussing the case "for several hours before being called to testify." First, as a nonprecedential opinion, *Flowers* is not binding. See Minn. R. Civ. App. P. 136.01(c) ("Nonprecedential opinions . . . are not binding authority except as law of the case, res judicata or collateral estoppel, but

---

[3] The Minnesota Supreme Court has not clarified whether "influence[ing] the testimony of other witnesses" or "attempt[ing] to influence the testimony of other witnesses" means any influence on the witness's testimony or only the substance of the witness's testimony.

nonprecedential opinions may be cited as persuasive authority."). Second, *Flowers* is factually distinguishable from this case. In *Flowers*, three officers who testified for the state at trial discussed the case when they were together in a conference room for several hours before being called to testify. 2009 WL 1684285, at *2. But in this case, we have a sergeant who sat in the courtroom watching the trial, one officer who already testified at trial, and two officers who were witnesses but had not yet testified, gather in a stairwell during a break to discuss the trial. It is true that in *Flowers* there was a clear violation of the sequestration order, and we affirmed the district court's denial of the motion for a mistrial because "[n]one of the officers *observed the actual testimony* of the other officers, and each was called to testify regarding different aspects of the case." *Id.* at *3 (emphasis added). Unlike *Flowers*, the sergeant here sat in the courtroom and observed other witness's testimony. He then used his personal observations of the trial testimony to relay information to the other two officers—his subordinates—who had not yet testified.

Garth argues that he was prejudiced because Sergeant L. "attempted to influence testimony." The state argues that Garth "conflat[es] the prejudice required to convince a *district court* to grant a mistrial, and the prejudice required to convince a *reviewing court* to reverse a jury's guilty verdict." Again, I agree with Garth. A sequestration violation, with nothing else, does not establish prejudice. *State v. Southern*, No. A17-0280, 2018 WL 414123, at *5 (Minn. App. 2018) (citing *State v. Miller*, 396 N.W.2d 903, 906 (Minn. App. 1986); *State v. Santos*, No. A24-1310, 2025 WL 1794044, at *3 (Minn. App. 2025) (citing *State v. Martin*, 773 N.W.2d 89, 110 (Minn. 2009) (refusing to grant a new trial since prejudice was not demonstrated following a sequestration violation)). "A mistrial

should be granted only if there is a reasonable probability, in light of the entirety of the trial including the mitigating effects of a curative instruction, that the outcome of the trial would have been different had the incident resulting in the motion not occurred." *Griffin*, 887 N.W.2d at 262.

Before a district court even considers granting a new trial, there must be some indication in the record that the sequestration order was violated, either through an "attempt to influence the testimony of other witnesses, or that the statements did influence the testimony of other witnesses." *Erdman*, 383 N.W.2d at 334. Here, I believe the fact that Sergeant L. "attempted to influence witness testimony" is not only enough for the district court to have granted Garth's motion for a mistrial but is also enough for this court to reverse. The district court found that Sergeant L. was not a witness at trial and was not subject to its sequestration order; that Officer G. had testified about Garth's identification *prior* to the stairwell conversation; that Officer N. testified about processing the crime scene *after* the stairwell conversation, and that all "officers testified credibly that the content of past and future testimony was not discussed." The district court determined that the testimony of Officers G. and N. related to completely different topics and concluded that there was nothing to suggest that the officers' 38-second stairwell conversation "intended to influence, or did influence, [witness] testimony."

Here, the majority rightfully points out that Garth does not show how the stairwell conversation significantly affected the outcome of his trial. But this begs the question: how could Garth have possibly shown that a secret stairwell conversation between police officers significantly affected the outcome of his trial? Suppose, for example, that the

attorney who overheard the stairwell conversation did not enter the stairwell when she did—how could Garth or his counsel have known about the stairwell conversation in the first place? Indeed, the only reason why this issue arose at trial was because another attorney happened to be in the right place at the right time and promptly reported her observation to defense counsel. To that end, moreover, I find it troubling that the sergeant and his officers quickly "became quiet" and dispersed in different directions upon realizing that the attorney was present in the stairwell. As a result, we do not know what would have resulted from the stairwell conversation. Even more concerning is that although the sergeant testified that he was "just providing [the officers] with reminders on how to respond," he also stated that it needed to be a "private conversation" because "somebody else [was] exiting the courtroom at the time."

The majority further notes that the district court permitted Garth's defense counsel to recall and cross-examine both witnesses who previously testified because of the stairwell conversation. This curative measure, according to the majority, mitigated any prejudice. But again, because we do not know what was discussed and what portion of the testimony may or may not have been affected, how could Garth adequately address the wrongdoing? And despite the majority's assurance that nothing of substantial consequence occurred, the circumstances here warrant greater scrutiny. The prejudice stemming from the sergeant's and the officers' deliberate disregard for the sequestration order in this case was an attempt to influence witness testimony, undermining the integrity of the proceedings. That prejudice, I would conclude, entitles Garth to a new trial.

In sum, "[e]ach decision we reach in individual cases . . . impacts the behavior of other state actors in the criminal justice system." *State v. Taylor*, 965 N.W.2d 747, 768 (Minn. 2021) (Thissen J., dissenting).[4] "Consequently, the rule we adopt in cases like this directly impacts the liberty interests of all Minnesotans and the structural fairness, and perceived fairness, of our criminal justice system." *Id.* The egregious behavior of the officers undermines the public's trust and confidence in the judicial system. Because the officers violated the sequestration order and because the violation prejudiced Garth, the district court abused its discretion in denying Garth's motion for a mistrial. As such, I would reverse and remand for a new trial.

---

[4] Although I would conclude that under the harmless-error standard the district court abused its discretion because its finding that Garth was not prejudiced by the sequestration violation is against logic and the facts in the record, I question if harmless error is the correct standard to use here. Although we typically address motions for a mistrial under the harmless-error standard, I believe that the unique facts present in this case warrant a structural-error analysis. "Structural errors are defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards." *State v. Kuhlmann*, 806 N.W.2d 844, 851 (Minn. 2011) (quotation omitted). Such errors "deprive defendants of 'basic protections'" by producing "consequences that are necessarily unquantifiable and indeterminate." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (holding that a violation of the Sixth Amendment right to choice of counsel qualified as a structural error that is not subject to harmless-error review). In *Gonzalez-Lopez*, the Supreme Court noted that the single factor of whether the error occurs during trial is not "the touchstone for the availability of harmless-error review" and outlined the importance of two other factors: (1) "the difficulty of assessing the effect of the error," and (2) "the irrelevance of harmlessness." *Id.* at 148-49 n.4. This case presents one of those rare circumstances where it is too difficult to ascertain the effect of the error because, as discussed above, we do not know what resulted from the secret stairwell conversation.